### ALLEYNE OTIS *vs.* CITY OF BOSTON.

O., a native of Boston, removed to New York in 1828, where he resided until 1840, at which time he returned to Boston, and continued an inmate of his father's family until 1848, when his father died. He then took rooms at a hotel, and remained in Boston, employed as executor of his father's will until April 5, 1849. During this whole period he frequently expressed an intention of leaฺฺ╷ng Boston, and removing to Europe, or New York. On the 5th April, 1849, ╷ℰ went to New York, intending to sail for Europe, and either to fix his residence in Paris, or return to New York. He did not sail from New York, but returned to Boston on the 7th of May, and sailed from that city, June 6, 1849. In June, 1850, he returned and established his residence at Newport. *Held*, he was an inhabitant of Boston, on the 1st May, 1849, for the purpose of taxation.

Otis *v.* City of Boston.

ASSUMPSIT to recover back a tax, assessed upon the plain-
tiff, as an inhabitant of the city of Boston, on the first day of
May, 1849, and paid by him under protest, June 11, 1851.
The case was submitted upon an agreed statement of facts,
as follows :

The plaintiff, a native of Boston, removed to New York in
1828, and became a citizen of New York, and engaged in
business as a commission-merchant in that city. In 1840
he retired from business, returned to Boston, and became an
inmate of his father's house, and was taxed as a citizen of
Boston for several years. He engaged in no business in
Boston, and had no house or establishment of his own in
said city, but frequently expressed an intention of leaving
Boston and removing permanently to Europe, or if he re-
mained in this country, of fixing his residence in New York,
remarking that his father's age was the only thing that kept
him here. In 1848 the plaintiff's father died, and his estab-
lishment was broken up. The plaintiff was one of the ex-
ecutors of his father's will, and much of the care of settling
the estate devolved upon him. He thereupon took rooms at
a hotel in Boston, and frequently said that he meant to get
away as soon as the estate was settled, or in the spring.
In the latter part of March, 1849, the plaintiff, having made
arrangements for a permanent absence from Boston, called
upon the mayor of the city to announce his intention of
thenceforth ceasing to be a resident of said city; and upon
the recommendation of the mayor, the plaintiff wrote to the
assessors of said city to signify his said intention.

The plaintiff, on the fifth day of April, 1849, gave up his
rooms at said hotel, and left Boston to sail from New York
for Liverpool, saying that he should fix his residence in Paris,
or if he ever returned to this country, make New York his
residence. From the fifth day of April till the seventh day of
May, 1849, the plaintiff remained in the city of New York,
with the exception of a visit of a few days to Washington
for his passport, and to take leave of some friends. On the
seventh day of May the plaintiff was called to Boston by the
urgency of business, which, owing to the absence from Boston

of his coexecutors and their attorney, there was no one to attend to. The said attorney, who was also the plaintiff's attorney, prolonged his absence from Boston, unexpectedly to the plaintiff, till the first day of June. On the last-named day said attorney returned to Boston, and the plaintiff, being thereby released from the necessity of his personal presence, sailed by the next steamer, of June 6, 1849, for Liverpool. During this interval, from May 7 to June 6, the plaintiff merely occupied a single room at a hotel, without a private parlor or table, which he had had during the winter. From England the plaintiff crossed into Switzerland, where he remained until September. During the whole summer of 1849, the cholera was prevalent in Paris. In September he went to Paris, where he remained several months. In June, 1850, he returned to New York, declaring that he found Paris no longer an agreeable residence, and shortly after went to Newport, where he now resides.

In December, 1850, during a temporary visit to Boston upon business, the plaintiff received the first notice that the tax had been assessed. The plaintiff was not taxed in any other place in 1849. The court may make such inferences from the facts as a jury would be competent to draw, and may render judgment accordingly.

Upon these facts judgment was rendered for the plaintiff by the court of common pleas, and the defendants appealed.

*P. W. Chandler,* (city solicitor,) for the defendants.

*H. Ritchie,* for the plaintiff. 1. The decision of the court of common pleas on all questions of inferences to be drawn from the facts agreed, is final and cannot be reëxamined on appeal. *Carroll* v. *Richardson,* 9 Mass. 329; *Wellington* v *Stratton,* 11 Mass. 394; *Hovey* v. *Crane,* 10 Pick. 440; *St.* 1840, *c.* 87, §§ 4, 5.

2. If the decision of the court of common pleas is not final on these questions, the facts prove an intention on the part of the plaintiff to abandon his residence in Boston in April, 1849, and that such intention was then actually carried into effect by him.

3. The declarations of the plaintiff, set forth in the agreed statement of facts, were competent and admissible evidence to prove his intentions. *Lyman* v. *Fiske*, 17 Pick. 234; *Thorndike* v. *Boston*, 1 Met. 247; *Kilburn* v. *Bennett*, 3 Met. 201; *Gorham* v. *Canton*, 5 Greenl. 266; *Burnham* v. *Rangeley*, 1 Woodb. & Minot, 7.

4. The plaintiff's intention to abandon his domicil in Boston, was sufficiently carried into effect in point of law. *Kilburn* v. *Bennett*, 3 Met. 199; *Makepeace* v. *Lee*, quoted in 5 Pick. 378; *Abington* v. *North Bridgewater*, 23 Pick. 170; *Putnam* v. *Johnson*, 10 Mass. 502; *Thorndike* v. *Boston*, 1 Met. 247; *Jennison* v. *Hapgood*, 10 Pick. 77; 2 Kent Com. (3d ed.) 430, note; *Harvard College* v. *Gore*, 5 Pick. 370; *Exeter* v. *Brighton*, 3 Shepl. 58; *Wilton* v. *Falmouth*, 3 Shepl. 479; *Green* v. *Windham*, 1 Shepl. 225; *Richmond* v. *Vassalborough*, 5 Greenl. 396; *Casey's Case*, 1 Ashmead, 126; *Lyman* v. *Fiske*, 17 Pick. 234; *Sears* v. *Boston*, 1 Met. 250; *Wilder* v. *Parker*, 3 Sumner, 593; Story Conflict of Laws, (3d ed.) §§ 44–47; *Atherton* v. *Thornton*, 8 New Hamp. 180.

5. If the plaintiff continued to be an inhabitant of Boston after he left it, and until he acquired a new domicil, he may be considered, upon the agreed facts, as having resumed his former domicil in New York. *Greene* v. *Windham*, 1 Shepl. 228; *State* v. *Frest*, 4 Harringt. 558; *State* v. *De Casinova*, 1 Texas, 401; *Whicker* v. *Hume*, 13 Beav. 366.

6. If the plaintiff in good faith abandoned his domicil in Boston, prior to May 1, 1849, his subsequent return, even if it constituted a resumption of that domicil, would not render him liable to taxation as an inhabitant of Boston on May 1, 1849. *Makepeace* v. *Lee*, 5 Pick. 378.

7. The fact that the plaintiff was not taxed in any other place in 1849 on his personal property, cannot affect the question.

SHAW, C. J. Assumpsit to recover the amount of a tax paid by the plaintiff, as a city and county tax, assessed on him for his poll and personal estate in May, 1849.

The determination of this question depends on a few plain principles. By the theory of taxation in this commonwealth,

every inhabitant shall be taxed for his personal property ; but as personal property has no locality, but follows the person, the place of taxation must be that where the person is an inhabitant at the time fixed by law for levying the tax, which for many years past has been the first day of May. All taxation upon the inhabitants shall be equal as far as practicable no citizen, therefore, can be twice rightfully taxed for the same property, the same year ; therefore a man cannot be an inhabitant in two different towns in the commonwealth at the same time.

With these preliminaries, which we think clear, let us look at the more particular provisions of law. Rev. Sts. c. 7, § 1 A poll-tax shall be assessed on every male inhabitant of the commonwealth, &c.

Section two provides that all property, real and personal, of the inhabitants of this state, not expressly exempted by law, shall be subject to taxation. This declares the general duty of inhabitants, and the general liability to taxation.

Section nine fixes the place; to wit, all personal estate, whether within or without this state, (except in certain cases not affecting this question,) shall be assessed to the owner, in the town where he shall be an inhabitant on the first day of May.

We think the law assumes, that if a person is an inhabitant of the state, he must be an inhabitant of some one town ; it assumes that this fact is capable of proof, and then it is adopted as a rule or standard, upon which other duties and liabilities are made to depend. It is not enough to say that it is difficult of proof, and depends upon shades of difference so minute, that the proof will be often nearly balanced and leave the fact in doubt. This is a very satisfactory reason why it is difficult, perhaps impossible, to lay down precisely any general rule by which to determine it. But when all the facts bearing upon the question, first important, then slight, then minute, if necessary to resort to them, are presented to the court by a statement of facts, special verdict, or otherwise, we are not at liberty to say, that the fact of being an inhabitant, or not, cannot be decided.

Nor is it consistent with these provisions, to hold that a man may be an inhabitant in one town for purposes of taxation, and in another for the enjoyment of political privileges or municipal rights. The being "an inhabitant" is a fact first to be fixed. These laws, we think, assume that a man may be an inhabitant of some one town in the commonwealth, and cannot at the same time be an inhabitant of any other; and that there are facts and circumstances attending every man's personal, social, and relative condition, which do determine in what town he is an inhabitant, and that these facts and circumstances are capable of judicial proof.

Perhaps this question has heretofore been somewhat complicated, by going into the niceties and peculiarities of the law of domicil, taken in all its aspects; and there probably may be cases where the law of domicil, connected with the subject of allegiance, and affecting one's national character, in regard to amity, hostility, and neutrality, is not applicable to his subject. But as a man is properly said to be an inhabitant where he dwelleth and hath his home, and is declared to be so by the constitution, for the purpose of voting and being voted for; and as one dwelleth and hath his home, as the name imports, where he has his domicil, most of the rules of the law of domicil apply to the question, where one is an inhabitant. Perhaps it would have been quite as near the purpose of the legislature, in fixing a standard of liability to taxation, perhaps not more so, to say that it shall be, where he hath his "home;" a word of Saxon origin, instead of where he shall be an inhabitant. To some minds, it might have been a little more intelligible.

Referring then to the cases, in which these subjects have been so fully and recently discussed, and the correctness of which we find no reason to doubt, we proceed to examine the case of Mr. Otis.

Boston was his domicil of origin, his native place, where he passed the earlier years of his life. He was beyond doubt an inhabitant of that place till 1828. He then left Boston, went to New York, took up his abode, and established himself in business there, and beyond doubt acquired a domicil or be-

came an inhabitant there.    This continued until his return to
Boston in 1840.    It is said that one's domicil of origin is more
easily regained than any other.    This is only one of those
modes of approximating to the proof of fact and intent, which
constitute a change of domicil in a doubtful case; because,
from the natural propensities of the human mind, one will
more readily be presumed to intend returning to his earliest
home than to a place of temporary abode.    It is but a slight
circumstance, but resorted to in a nicely balanced case, where
slight circumstances will turn the scale.    But that is not at
all necessary, nor is it of any weight in the present case.    Mr.
Otis came to Boston without any definite intent to return to
New York ; he had his abode there eight years, and until the
decease of his father in 1848.    He was one of the executors
of his father's will, and remained there in the performance of
his duties as such, until April, 1849.    The question is then
brought to this, whether anything was done by Mr. Otis, by
which he ceased to be an inhabitant of Boston, between April
5 and May 1, 1849.

In general, it is laid down as a fixed rule on this subject,
that every man must have a domicil; that he can have but
one; and that of course a prior one will not cease until a
new one is acquired.    It is then asked, what is the condition
of one who has purchased or hired a house, or otherwise fixed
his place of abode in another place, left the town of his last
abode, with all his property and furniture, and is on his way
to his new abode; is he an inhabitant of the place from which
he has departed?    If his removal were towards another town
in this state, we think his place of being an inhabitant would
not be changed.    He would certainly continue to be an in-
habitant of the state, and taxable in some town    and the only
question would be, in which he was an inhabitant on the first
of May.    Three might claim him : the one he has left, the
one he is in, and the one to which he is proceeding.

In such case we think the rule would apply, and his home
would not be changed, either to the place of his actually
bodily presence, or of his destination, because in neither would
the fact of actual presence and the intent to reside concur.

Not the place where he was *in itinere*, for want of the intent; nor of his destination, for want of his actual residence. If he had left the state and actually passed its limits on his way to a distant state, it would certainly be a question of more difficulty in its various aspects, as fixing his citizenship with a view to succession and the like. But we have no occasion to determine such a question, because there are no facts which bring the case within this rule. It was argued that the case of *Kilburn* v. *Bennett*, 3 Met. 199, was decided on this ground; but we think the decision will not bear that construction. The plaintiff had sold his farm, left Groton, went to his brother in Tyngsborough, with an ultimate intent to go to Illinois, but to make his home in Tyngsborough until his removal.

In April Mr. Otis went to New York, but avowedly to take passage for Europe; it was not with any intent to resume his residence in New York as a home. His frequent intimations that it was his intention, after the decease of his father, to go to Europe, were accompanied with no act having a tendency to carry such an intention into effect. And so when he returned to Boston after the first of May, and sailed thence at the end of that month. He had fixed no place of abode definitely. He sailed for England, but not to stay there. He thought of going to Paris; but with a purpose so indefinite, that he was induced, by the existence of cholera in Paris, to go to Switzerland. Indeed, the most definite declaration of purpose, when he was about taking his departure for Europe was, that he should reside in Paris, or if he returned, should settle in New York. We attach no importance to the fact of his returning to Boston in May, 1849, and sailing from there instead of New York; independently of that circumstance, we think he was an inhabitant to the fifth of April, and that he had not ceased to be an inhabitant of Boston, certainly until he sailed for Europe, after the first day of May. How much longer he may have been considered an inhabitant of Boston, we give no opinion. We are of opinion, therefore, that he was liable to taxation in Boston on the 1st of May, 1849, and therefore cannot maintain this action. *Judgment for the defendants.*